Eric J. Benink, Esq., SBN 187434
Mary K. Wyman, Esq., SBN 260104
KRAUSE KALFAYAN BENINK & SLAVENS, LLP
625 Broadway, Suite 635
San Diego, CA 92101
Tel.: (619) 232-0331
Fax: (619) 232-4019
eric@kkbs-law.com
mwyman@kkbs-law.com

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BRANDON EVANS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BBG COMMUNICATIONS, INC., a Delaware corporation, and DOES 1 - 10,<br><br>Defendants. | Case No. 310-cv-00542-H-NLS<br><br>**PLAINTIFF BRANDON EVANS'S SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Date: September 3, 2010<br>Time: 11:00 a.m.<br>Courtroom: 13<br><br>Hon. Marilyn L. Huff |

# I.
# INTRODUCTION

The Court should apply California law in this relatively straightforward consumer class action. There is no true conflict of law because The Bahamas has no interest in applying its telecommunications law; that law only governs Bahamian corporations operating from the Bahamas. In contrast, California has a substantial interest in regulating businesses operating from California.

Consumer claims supplement and play a vital role in the regulatory scheme and thus, do not "interfere" with federal law as BBG contends. And there is no reason to refer this action to the Federal Communications Commission ("F.C.C."). The courts, not the F.C.C. have the expertise in the area of consumer advertising and disclosures under the Unfair Competition Law ("UCL"). In addition, the F.C.C. previously provided guidance on advertising issues in a policy statement; thus, the Court can ascertain the F.C.C.'s position on these matters if necessary. Moreover, judges in this judicial district have recently declined to refer UCL claims to the F.C.C. after granting a motion to dismiss a Section 201(b) claim, albeit without expressly or directly discussing whether such claims should be preempted.

BBG's motion to dismiss should be denied in its entirety.

# II.
# ARGUMENT

## A. CALIFORNIA LAW PRESUMPTIVELY APPLIES

A federal district court sitting in diversity applies the law of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); see also *Leonard v. The College Network*, 2004 WL 2944050 at *6 (N.D. Cal. 2004). "Generally, the preference is to apply California law, rather than choose the foreign law as a rule of decision." *Strassberg v. New England Mut. Life Ins. Co.,* 575 F.2d 1262, 1264 (9th Cir. 1978). In addition, the foreign law proponent bears the burden of proving that a foreign law applies. *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001).

## B. CHOICE OF LAW STANDARD IN CALIFORNIA

In support of its argument that Bahamian law applies, BBG takes refuge in a theory that the entirety of the harm took place in The Bahamas. Even if this were accurate (which as discussed below, is not), the concept of applying the "law of the place of the wrong" was long ago rejected by the California Supreme Court. See *Reich v. Purcell,* 67 Cal.2d 551, 554 (1967) ("that law no longer affords even a semblance of the general application that was once thought to be its great virtue.")

Instead, the Court must employ California's governmental interest test to determine whether California or Bahamian law applies. The test involves three steps:

First, the foreign law proponent must identify the applicable rule of law in each potentially concerned state and must show it materially differs from the law of California;

Second, if . . . the trial court finds the laws are materially different, it must proceed to the second step and determine what interest, if any, each state has in having its own law applied to the case;

Third, only if the trial court determines that the laws are materially different and that each state has an interest in having its own law applied, thus reflecting an actual conflict, must the court take the final step and select the law of the state whose interests would be 'more impaired' if its law were not applied. *Zinser,* 253 F.3d at 1187 citing *Wash. Mut. Bank v. Superior Court*, 24 Cal.4th 906 (2001).

**C. UNDER THE GOVERNMENTAL INTEREST TEST, CALIFORNIA LAW APPLIES**

BBG has failed to meet its burden under each of the three prongs of the governmental interest test.

a. BBG Has Not Sufficiently Demonstrated that the Laws are Materially Different

BBG has not met its burden of demonstrating that the laws of California and The Bahamas differ with respect to claims by telecommunications consumers who were misled. BBG contends that under the Bahamas Communications Act, 2009 ("BCA") § 40(h), "the Bahamian Utilities Regulation & Competition Authority ("UCRA") may require a telecommunications company to

disclose their rates only where an entity has market power." (Dft. Supp. Brf. (Doc. No. 24) 2: 20 -23.)

But Section 40(h)'s contours are not so clearly defined. Section 40(h) *allows* the UCRA to impose obligations on SMP licensees related to the provision of *standard terms of business*[1], which should be published or accessible to customers. It does not immunize a licensee from liability for misleading customers about its rates and charges.

Furthermore, BBG cites no authority demonstrating that the Bahamian Consumer Protection Act, 2006 ("CPA"), a separate statute, could not be used to prosecute the claims here. If the UCL and the CPA (the two analogous statutes) are not materially different, the inquiry ends. Instead, BBG asks the Court to simply accept that the BCA necessarily preempts the CPA and other claims under Bahamian law alleging misleading business practices.

b. <u>The Only Conflict, if One Exists, is a "False Conflict"</u>

Assuming that the BCA precludes any claim from being asserted by a consumer against BBG, the only conflict that exists is a "false conflict." A false conflict is one where the competing states have conflicting laws, but the foreign jurisdiction has no interest in applying its law under the facts alleged. *Hurtado v. Superior Court,* 11 Cal.3d 574, 580 (1974). If a false conflict is present, the governmental interest inquiry ends.

BBG expresses dismay that Evans could even suggest that The Bahamas would not have an interest in applying its telecommunication statutes. See Dft. Supp. Brf. 3:20 - 25. ("The mere fact that the Bahamian government enacted [the law] . . .demonstrates that the Bahamian government, a sovereign nation, believes it has an interest in the regulation of telecommunications services. . .To argue otherwise would defy logic and common sense. . .") BBG misses the point.

Any given jurisdiction has a *general* interest in applying its laws; but that does not mean that it has an interest in applying a particular law *in every circumstances*. For example, in *Hurtado,* 11 Cal.3d 574, plaintiff, a Mexican national, was injured in California by defendants,

---

[1]It is unclear whether charges are "standard terms of business."

who were Californians. The defendants sought to apply a Mexican law that capped personal injury damages. The California Supreme Court found that Mexico had no interest in applying its damages limitation law because the law was designed to protect Mexican defendants and defendants were Californians. *Id*. at 583. ("Thus, the interest of Mexico at stake is one aimed at protecting resident defendants in wrongful death actions and, as previously explained, is inapplicable to this case, because defendants are not Mexican residents.")

A true conflict, on the other hand, was illustrated in *Bernhard v. Harrah's Club,* 16 Cal.3d. 313 (1976) (*abrogated on other grounds by statute.*) There, a Nevada tavern keeper over-served a California patron who was subsequently involved in a car accident in California. Nevada law immunized tavern keepers from liability, while California law at the time, allowed actions against tavern-keepers. The California Supreme Court found that a true conflict existed because Nevada had an interest in protecting Nevada businesses and California had an interest in "protecting members of the general public from injuries to person and damage to property resulting from the excessive use of intoxicating liquor." *Id*. at 316 citing *Vesely v. Sager,* 5 Cal.3d 153, 165 (1971) (*abrogated on other grounds by statute.*)

The reasoning of *Hurtado* applies here. BBG seeks to apply Section 40(h) of the BCA, which according to BBG "does not permit the UCRA to require entities that do not have market power to disclose their rates." (Dft. Supp. Brf. 2:21 - 23.) The Bahamas might have an interest in applying the BCA if BBG were incorporated in and operated from The Bahamas. See BCA § 26(3)(a)-(b). But BBG is a California corporation that conducts all of its operations from San Diego, California. It has no place of business in The Bahamas and more importantly, is not subject to the BCA. The Bahamas has no interest in shielding BBG, a California entity, from liability. Likewise, it has no interest in denying Evans recovery under California law.

BBG struggles with the concept that BBG can provide the services alleged in the FAC and not be subject to the BCA (which it admits it is not), at the same time. There are numerous reasons why this may be the case. For example, another entity may connect the portion of the call originating from the payphone to BBG in the United States and thereafter BBG connects the call

once it reaches telecommunications equipment in the United States. In any event, BBG fails to address the obvious fact that a portion of the underlying telecommunications service necessarily occurs in the United States (even setting aside the operator services, billing services, rate setting, and contract formation that Evans alleged occurs in San Diego.) Certainly the UCRA does not assert jurisdiction over transmissions occurring in North Carolina or credit card charges originating from San Diego.

This case is similar to *Clothesrigger, Inc. v. GTE Corp.*, 191 Cal.App.3d 605 (1987). There, plaintiff alleged fraud and unfair business practice claims against telecommunications companies "asserting defendants charge[d] subscribers to the Sprint long distance telephone system for certain unanswered long distance calls without disclosure." *Id.* at 606. At least one defendant was headquartered in California and another disseminated the fraudulent advertising and promotional literature from offices in California. *Id.* at 608. The trial court denied class certification of a nationwide class citing its reluctance to "be the savior of the other 49 states of the union." *Id.* at 607. The Court of Appeal rejected this approach and held:

> The court simply erred in stating that California has no interest in providing nonresident plaintiffs greater protection than their home states provide. California's more favorable laws may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying such persons full recovery.

*Id.* at 610. It remanded the matter with instructions to apply the governmental interest test.

Finally, in an attempt to undermine the application of *Hurtado* to the allegations here, BBG cites *Coufal Abogados v. AT&T, Inc.*, 223 F.3d 932 (9th Cir. 2000) and asserts that The Bahamas has a "substantial interest in this case." (Dft. Supp. Brf. 5:8). But *Coufal Abogados* involved a tortious interference claim by Coufal Abogados, a Mexican law firm that entered into a Mexican contract, governed by Mexican law, to be performed completely in Mexico. Coufal Abogados sought to apply New York law simply because defendant AT&T's state of incorporation was New York. The 9th Circuit understandably found that Mexican had an interest in applying its law.

BBG's reliance on *Hernandez v. Burger,* 102 Cal.App.3d 795 (1980) is likewise weak considering that the Northern District of California stated that the case was "of dubious authority"

and founded on "perverse logic." *Marsh v. Burrell,* 805 F.Supp.1493, 1499 (N.D. Cal. 1992).

c. California's Interest Would Be More Impaired

Assuming *arguendo* that the Court determines that a true conflict exists, California's interest would be more impaired if its law were not applied.

Under the third prong of the test, the task is "not to determine . . .the better or worthier rule, but rather to decide-in light of the legal question at issue and the relevant state interest at stake--which jurisdiction should be allocated the predominating lawmaking power under the circumstances of the present case." *McCann v. Foster Wheller, LLC.*, 48 Cal.4th 68 (2010). It should be noted that a thorough discussion of this prong is also found in *Costco Wholesale Corp. v. Liberty Mutual Ins. Co.*, 472 F.Supp.2d 1183 (S.D. Cal. 2007). According to *Costco*, the relevant factors are a) the relative commitment of each jurisdiction to the rule, b) the history and current status of the rule, c) the function and purpose of the rule, and d) the relevant contacts. *Id.* at 1202 - 1207.

Relying on *McCann*, BBG argues that The Bahamas' interest predominates because "the conduct that forms the basis of Plaintiff's claims is based on a phone call that Plaintiff made from a payphone on Bahamian soil." (Dft. Supp. Brf. 6: 21 - 23.) The flaw in BBG's argument is that it focuses only on a single point in the business practices at issue. It ignores the fact that BBG's practices span two countries (the BBG operator works in San Diego and the call was connected to North Carolina), BBG developed the disclosure policies and the contracts with the payphone operators were executed in San Diego, and the injury occurred as a direct result of BBG's billing personnel in San Diego imposing fees against Evans's credit card (presumably at some later point after the call was made.) If anything, BBG operates in California and throughout the world. And "a company that conducts business in numerous states ordinarily is required to make itself aware of and comply with the law of a state in which it chooses to do business." *Kearney v. Solomon Smith Barney*, 39 Cal.4th 95, 105 (2006); see also FAC ¶ 9 ("According to its website's Privacy Policy, 'BBG provides *international* telecommunications services, including public telephony, calling card, long distance operator assistance, credit card processing, billing, collection and wireless telecommunication services.'") (Italics added.)

The *Costco* factors demonstrate that California's interests would be more impaired. The UCL is an actively-litigated statute that was enacted in 1977. Westlaw shows that there are over 74,000 "citing references" to Cal. Bus. & Prof. Code § 17200. Westlaw also shows that 100 cases have cited Section 17200 just in the past 60 days. The UCL plays such a significant role in California's legal landscape that it was even the subject of a ballot initiative in 2004. (Proposition 64.) Thus, California has demonstrated an enormous commitment to the UCL. In comparison, BBG relies on a single subsection of the BCA, which was enacted only last year. There is little known about the import of this subsection and how it might apply here.

Furthermore, the UCL "focuses on the defendant's conduct, rather than on the plaintiff's damages, in keeping with its larger purpose of protecting the general public against unscrupulous business practices." *Weinstat v. Dentsply Intern. Inc.*, 180 Cal.App.4th 1213, 1223, fn. 8 (2010) citing *In re Tobacco II,* 46 Cal.4th 298, 312 (2009). Indeed, "California [] has a legitimate interest in preserving a business climate free of fraud and deceptive practices." *Diamond Multimedia Systems, Inc. v. Superior Court,* 19 Cal.4th 1036, 1064 (1999).

Finally, as discussed above, the contacts with California are as significant, if not more significant, than the contacts with The Bahamas.

**D. BBG MAKES NO EFFORT TO DEMONSTRATE WHY BREACH OF IMPLIED CONTRACT AND CONVERSION CLAIMS COULD NOT PROCEED**

The Court requested briefing addressing the choice of law for *all* claims. Despite carrying the burden to do so, BBG did not attempt to explain how the law regarding California breach of implied contract and conversion claims are different under Bahamian law.

**E. EVANS'S CLAIMS ARE NOT PREEMPTED**

BBG raises two preemption arguments. It contends that 1) Evans's UCL claim is barred by the implied conflict preemption doctrine and 2) Evans must file his claims before the FCC. Neither is persuasive.

______a. <u>No Implied Conflict Exists</u>

______BBG asserts that "any claim that would require BBG Communications to lower its prices to meet a consumer's subjective expectations is preempted under the implied conflict preemption

doctrine." (Dft. Supp. Brf. 10: 12 - 14). Under conflict preemption, an aberrant or hostile state rule is preempted to the extent it actually interferes with the "methods by which the federal statute was designed to reach [its] goal." *Ting v. AT&T,* 319 F.3d 1126, 1137 (9th Cir. 2003) citing *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).

But Evans does not seek a remedy that would require BBG to lower its rates to "fall in line with consumer expectations." Rather, Evans claims that BBG's practice of advertising a rate of $.69 per minute is unfair given that it actually charges undisclosed fees (e.g. connection charges) and employs a minimum number of minutes. BBG can "charge" whatever it desires, so long it the charges are properly disclosed. BBG is concerned that once its true charges are properly disclosed, no one will use its services.

BBG also asserts that Evans's claims interfere with the free market in contravention of Congress's chosen means of enforcing Section 201. (Dft. Supp. Bfr. 10:14 - 15). Even if Evans's claims mirrored Section 201 claims, state consumer laws are an integral part of the regulatory scheme and are not preempted. The deregulation of the market and elimination of the tariff filing requirement opened the door to state contract and consumer protection laws that had previously been excluded. *Ting*, 319 F.3d at 1142 - 1143. As a result, consumer protection laws actually form part of the competitive framework. *Id.* at 1145 ("Unlike rate filing, this market-based method depends in part on state law for the protection of consumers in the deregulated and competitive marketplace. This dependence creates a complimentary role between federal and state law under the 1996 Act."); see also FCC Second Report and Order, 11 F.C.C.R. 20,730 (1996) at ¶ 38 ("Moreover, we note that in the absence of tariffs, consumers will be able to pursue remedies under state consumer protection and contract laws in a manner currently precluded by the 'filed-rate' doctrine."); *Ting*, 319 F.3d at 1142 - 1143 ("In the post-tariff environment, we find no reason to imply a conflict between otherwise complimentary state and federal laws. In deregulated markets, compliance with state law is the norm rather than the exception.")

b. <u>Consumer Claims are Not Preempted</u>

Evans recognizes that the holding in *North County Comm. Corp. v. California Catalog Technology* 594 F.3d 1149 (9th Cir. 2010) requires a party to first seek a determination from the

F.C.C. for *Section 201(b) claims*. The FAC, of course, contains no Section 201(b) claim. Nevertheless, BBG argues that the UCL claim recasts a Section 201(b) claim, and thus should be similarly precluded.

But as recognized by the Ninth Circuit in *Ting*, *supra,* consumer claims supplement and play a vital role in the regulatory scheme. Indeed, other jurisdictions have expressly rejected the notion that state consumer claims must first be referred to the F.C.C. See e.g. *In re Long Distance Telecommunications Litigation*, 831 F.2d 627, 633 (6th Cir. 1987) ("We believe the district court erred in holding that the state law claims for fraud and deceit, based on the defendants' failure to notify customers of the practice of charging for uncompleted calls, were preempted by the Communications Act" citing *Far East Conference v. U.S.,* 342 U.S. 570, 574 (1952)); *Kellerman v. MCI Telecommunications Corp.*, 112 Ill.2d 428, 447 (Ill. 1986) ("The issue of whether defendant's failure to disclose certain charges is 'unjust or unreasonable' under section 201(b) of the Communications Act has no relevance as to whether defendant's failure to disclose those charges constituted fraud, a breach of contract, or a violation of Illinois' statutes."); *Shaw v. AT&T Wireless Services, Inc.*, 2001 WL 539650 at *4 (N.D.Tex. 2001) ("the FCA's savings clause indicates that Congress intended to preserve state law causes of action for breaches of duties that do not exist under the Act.")

In fact, both Judge Sabraw and Judge Moskowitz have declined to dismiss a UCL claim after granting a motion to dismiss a Section 201(b) claim based on *North County*, albeit neither expressly discussed the issue of preemption. See *Carney v. Verizon Wireless Telecom, Inc*. 2010 WL 1947635 (S.D. Cal., May 13, 2010) and *Epstein v. AT&T Communications of California, Inc*. 2010 WL 3000202 (S.D. Cal., July 30, 2010).

Furthermore, unlike in *North County*, which involved exceedingly complex compensation issues between carriers and providers, the issues raised herein are straightforward. Fortunately, the FCC (together with the Federal Trade Commission) has already provided instructions with regard to these issues. See *Joint FCC/FTC Policy Statement for the Advertising of Dial-Around and Other Long Distance Services to Consumers* 65 F.R. 44053-02 (July 17, 2000) ("*Policy Statement*") (thoroughly discussing types of misrepresentations regarding per-call charges, monthly

fees, minimum charges, proximity and placement of disclosure, etc. and citing numerous other policies pertaining to these issues.) It is noteworthy that the *Policy Statement* states: **"As a matter of clarification, we note that this Policy Statement does not preempt existing state law."** Id. at 44054. (emphasis added.)

### F. BBG IS LIABLE FOR THE STICKER

BBG provides unsolicited argument regarding duties to disclose and the sticker on which Evans relied. (Dft. Supp. Bft. 9:7 - 10: 8). It argues: "how could a carriers allegedly operating in California know what stickers an unidentified third party placed on a payphones it services that are physically located on the other side of the world?" (Dft. Supp. Bfr. 9:28 - 10:2). But the answer is in the FAC. BBG (according to its own web site) provides international telecommunication services, including public telephony, calling card, long distance operator assistance, credit card processing, billing, collection and wireless telecommunication services. (FAC ¶ 9.) In this role, it *contracts with* and forms *joint ventures* with payphone operators and the parties share revenues from the long distance calls. (FAC ¶ 10.) BBG knows that the stickers placed on the payphones contain partial and inaccurate information and that the consumers rely on that information when deciding to use its service. (*Id.*)

## III.
## CONCLUSION

This Court can effectively adjudicate the UCL, breach of contract, and conversion claims asserted by Evans, on behalf of himself and a nationwide class, which includes class members in California. Evans respectfully requests that the Court deny BBG's motion to dismiss in its entirety.

DATED: October 4, 2010

KRAUSE KALFAYAN
BENINK & SLAVENS, LLP

/s/ Eric J. Benink
Eric J. Benink
Attorneys for Plaintiff
eric@kkbs-law.com