## SALES LOCATION AGREEMENT

This Sales Location Agreement (this "Agreement") is made and entered into by and between [BAHAMAS COMMUNICATIONS SERVICES, LTD.] ("BCS"), and NASSAU PORT DEPARTMENT ("Client.") BCS and Client are hereinafter referred to together as the "Parties" and each as a "Party."

In consideration of the following mutual recitals, covenants, warranties and representations, BCS and Client agree as follows:

### RECITALS

A.      Client is desirous of engaging BCS to assist Client in providing Operator Assisted Calls (OAC's) to guests of its hotel.

B.      Client is the owner and/or duly authorized manager of the Sales Location(s) listed in Schedule I attached hereto.

C.      BCS will provide services to enable guests of Client to make OACs at the location(s) listed in Schedule I hereto, upon the terms and subject to the conditions contained in this Agreement; and Client is willing to utilize such services, upon the terms and subject to the conditions contained in this Agreement.

D.      The Parties desire that BBG Global AG should join in this agreement for the purposes of giving the undertakings, ratifications and agreements made in the clause at the foot or the end of this agreement and have given consideration as set forth therein.

THEREFORE, in consideration of the promises and the mutual covenants and agreements contained in this Agreement, BCS and Client agree as follows:

### ARTICLE 1: DEFINITIONS

For purposes of this Agreement, the following defined terms shall have the following designated meanings:

"Billable Call"      means a completed Call that begins after billing has been approved by an operator or accepted as a collect call by the called party and communication between the calling and called parties has begun.

"Call"      means an international billable, collect, credit card, calling card, or third party billed telephone call placed by an End User on the System.

"Call Platform"      means the operator facilities, switches, and telecommunications system used by BBG Global A.G. to route, complete and process Calls.

"Commission"      means the compensation payable to Client, determined in accordance with Schedule II attached hereto.

"Effective Date"      means the date on which the BCS calling instructions and advertising materials are placed on display by Client at the Sales Location(s).

"End User"      means a Person who uses a Telephone to place Calls on the System.

"Force Majeure"      means any occurrence (including, but not limited to the complete failure of access to power or natural sources of supply, acts injunctions or restraints of government or laws and regulations (including, but not limited to the imposition of export restrictions or controls) imposed against all providers of similar services not occasioned by the conduct of either Party, whether the occurrence is an act of God or public enemy, or caused by war, terrorism, annual military service, riot, storm, earthquake, or other natural forces, or by the acts of anyone not a party to this Agreement.

"Initial Term"      means the thirty-six (36) month period commencing on the Effective Date.

"Laws"      means all applicable statutes, laws, treaties, ordinances, rules, regulations, orders, writs, injunctions, decrees, judgments, or opinions of any Tribunal.

"Person"      means any individual, entity, corporation, or Tribunal.

"Sales Location"      for purposes of this Agreement each location, hotel or other property specified in Schedule I hereto.

"Services"      means any operator assisted telecommunications service relating to the completion of Calls initiated from a Telephone and terminating in a country into another country.




EXHIBIT 1

| | |
|---|---|
| "System" | means the telecommunications system utilized by BCS for the provision of Services, including, but without limitation, all switching equipment, networking circuitry and facilities, and other hardware and software utilized by BCS for the provision of Services. |
| "Telephone" | means a telephone located in any Sales Location. |
| "Term" | means the Initial Term and any Renewal Terms (as defined in Section 3.1 below) of this Agreement. |
| "Tribunal" | means any (a) local, state, or federal judicial, executive, administrative, regulatory, or legislative instrumentality, and (b) private arbitration board or panel. |

## ARTICLE 2: SERVICES TO BE RENDERED BY BCS

2.1 Services to be Rendered by BCS. BCS shall provide telephone long distance automated or live operator services to Client's Sales Location(s) listed in Schedule I attached hereto and shall charge End Users for the Services, compensating Client as provided hereinafter and as set forth in Schedule II attached hereto.

2.2 Operating the Service. BCS shall coordinate the installation of the required equipment (if any) at the Sales Location(s) and reprogramming to enable End Users to make Calls outside the country. BCS shall coordinate the installation of the equipment with the existing telephone system at each Sales Location with minimal, if any, disruption of the existing system. BCS shall use the services of a licensed carrier to transport a Call from the Sales Location to the Call Platform. BCS, exclusively through the Call Platform, shall provide the Services from a foreign country re-transmitting and completing Calls originated at the Sales Location(s), utilizing for such purposes the services of a live or an automatic operator. BCS shall be solely responsible for providing the Services to End Users and ensuring the quality of such Services, and Client shall have no responsibilities in that regard. BCS' covenants hereunder are a material provision of this Agreement.

2.3 Publicity. Client shall permit BCS to place its calling instructions and advertise the Services at the Sales Location(s), at BCS's sole cost, including but not limited to, installation of stickers and/or decals on Telephone handsets and installation of tent cards in each room of the Sales Location(s) in which a Telephone is installed, subject to Client's reasonable approval of the exact placement of such stickers, decals, and tent cards in each room.

## ARTICLE 3: TERM AND TERMINATION



3.1 Term. This Agreement shall be in effect for the Initial Term and any Renewal Terms (as defined below), unless earlier terminated in accordance with the provisions of Section 3.2 below. This Agreement will be automatically renewed for an additional period of twelve (12) months ("Renewal Term"), unless either Party gives the other Party written notice of termination within five (5) days after the expiration of the Initial Term or Renewal Term. Each Renewal Term shall be subject to the same terms and conditions set forth in this Agreement, including the automatic renewal provisions.

3.2 Termination. Either Party may terminate this Agreement with Cause, at any time upon thirty (30) days prior written notice to the other Party provided the reason for termination set forth in such notice is not cured within such thirty (30) day period. "Cause" shall mean (i) a material breach of the terms and conditions of this Agreement or (ii) the inability of the Parties to agree upon renegotiated terms of this Agreement within sixty (60) days of the end of the two (2) month period set forth in Section 3.3 below. Notwithstanding the foregoing, if Client attempts to terminate this Agreement for the failure of BCS to pay Commission when due, Client may not terminate this Agreement, if BCS (i) in good faith, disputes the amount requested, (ii) initiates arbitration to settle the dispute within the thirty (30) day notice period, and (iii) deposits the amount in dispute with an arbitrator or escrow agent. BCS may also terminate this Agreement upon sixty (60) days written notice to Client without a breach on Client's part, if due to market or regulatory changes or conditions BCS determines, in its sole discretion, that it can no longer continue the Commission payments provided for herein and BCS and Client are unable to agree upon a revised Schedule of Commission.

3.3 Suspension of Obligations Under this Agreement. Subject to Section 3.2 above, if an event of Force Majeure occurs, the Parties shall be excused from their performance obligations under this Agreement (including the payment of Commission and the rendering of Services) for a reasonable amount of time to remedy the effects of such occurrence. If the occurrence of Force Majeure remains in effect for a period of two (2) months, BCS and Client hereby agree to promptly renegotiate the terms of this Agreement.

## ARTICLE 4: COMPENSATION TO CLIENT

4.1 Payment of Commission to Client. BCS shall pay Commission to Client in accordance with Schedule II attached hereto. Commission shall be payable only as specified in Schedule II hereto. Such Commission will be paid in Bahamian dollars by check sent via Federal Express (or comparable international courier service) to Client's address for notices under this Agreement or by international wire to its bank account (which bank account information shall be provided to BCS in writing) on or before the 45th day after the end of each calendar month.

4.2 No Withholding or Deduction. All Commission payments to Client shall be made without withholding, or deduction by BCS, except: (i) as otherwise required by applicable Laws; (ii) as mutually agreed to by the Parties hereto; (iii) if BCS elects to do so, BCS may offset Commission payments against advance Commission; and (iv) all bank and transfer charges of Client shall be paid by Client. Unless otherwise indicated in Schedule II, Commission payments are reflected in Bahamian dollars and shall be subject to the conversion rate in effect on the day such payments are made.

4.3 Web Portal Reporting. Client shall be given access to BCS's real time web portal where Client can view all account information related to Commission payments resulting from the Services. BCS will use reasonable efforts to ensure that the web portal is accessible 24 hours a day, 365 days per year.

## ARTICLE 5: COVENANTS

5.1 Exclusive Arrangement. During the Term of this Agreement, Client agrees that he/she/it shall utilize Services, as defined hereinabove, only provided by BCS and shall not utilize such similar or comparable services provided by any other Person. This exclusive arrangement shall not preclude End Users from direct-dialing through the local telephone companies. However, Client shall assure that its telephone equipment does not allow "speed dialing" or similar shortcuts to access other telecommunications companies or carriers who provide services similar to the Services provided by BCS, nor shall any advertising or promotion for such other companies or carrier be allowed or conducted in any Sales Location.

5.2 Compliance with Laws. In the course of performing their respective duties under this Agreement, BCS and Client agree that each will not violate the provisions of any Laws, including, without limitation, any Law promulgated in the country in which the Sales Location(s) are located, or any other country in which Services are sold and which has regulatory authority over the provision of Services.



5.3 Trade Secrets and Confidential Information. Client specifically agrees that he/she/it will not at any time, whether during or subsequent to the expiration or termination of this Agreement, in any fashion, form or manner, unless specifically consented to in writing by BCS, either directly or indirectly use or divulge, disclose, or communicate to any Person, in any manner whatsoever, any trade secrets, confidential or proprietary information of any kind, nature, or description concerning any matter affecting or relating to the business of BCS, including, without limitation, the terms of this Agreement. If any trade secrets, confidential or proprietary information is required to be disclosed by any Laws of the country in which Client is located, Client shall promptly notify BCS and unless notified otherwise by BCS in writing, Client will proceed on the basis that it will comply with such disclosure request only to the extent required by law and if possible Client will cooperate with BCS to limit the disclosure of such information.

## ARTICLE 6: MISCELLANEOUS

6.1 Notice. Whenever this Agreement requires or permits any consent, approval, notice, request, or demand from one Party to another, such communication must be in writing and sent via fax or overnight courier to be effective and shall be deemed to have been given on the business day in which it is actually received.

6.2 Survival. All covenants, agreements, representations and warranties in Articles 5 and 6 shall survive the expiration or termination of this Agreement with the exception of Article 5.1.

6.3 Binding Arbitration. In the event of any dispute with respect to the terms of this Agreement the Parties shall send written notice of their respective positions to the other Party and will exert good faith efforts to resolve the dispute, if the dispute is not settled at the expiration of thirty (30) days from the date the first written notice is received by either Party, then the entire matter shall be submitted to binding arbitration. Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the Arbitration Act, Ch. 180, revised State Laws of The Bahamas 2000 as at present in force. The number of arbitrators shall be one. The place of arbitration shall be Nassau, Bahamas. The language(s) to be used in the arbitral proceedings shall be English.

6.4 <u>Governing Law</u>. The Parties agree that for their mutual convenience the laws (other than the conflict of laws provisions thereof) of the Commonwealth of The Bahamas shall govern the rights and duties of the Parties and the validity, construction, enforcement, and interpretation of this Agreement.

6.5 <u>Invalid Provisions</u>. If any provision of this Agreement is held to be illegal, invalid, or unenforceable, such provision shall be fully severable; this Agreement shall be construed and enforced as if such provision had never comprised a part hereof and the remaining provisions shall remain in full force and effect and shall not be affected by such provision or by its severance.

6.6 <u>Entirety and Amendments</u>. This Agreement represents the final agreement between the Parties with respect to the subject matter hereof and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements by the Parties. There are no unwritten oral agreements between the Parties. This Agreement may be amended only by an instrument in writing executed by the Parties. The terms and provisions of this Agreement will control any conflict between the terms and provisions of this Agreement and the terms and provisions of any other agreement.

6.7 <u>Waivers</u>. No course of dealing nor any failure or delay by either Party, or its respective officers, directors, employees, representatives, or attorneys with respect to exercising any right or remedy available to it hereunder shall operate as any waiver thereof under this Agreement. A waiver must be in writing and signed by the waiving Party to be effective, and such waiver will be effective only in the specific instance and for the specific purpose for which it is given.

6.8 <u>Parties Bound; Assignments</u>. This Agreement is binding upon, and inures to the benefit of the Parties, and their respective successors and assigns; provided, that, Client may not, without the prior written consent of BCS, assign any rights, duties, or obligations hereunder; any purported assignment in violation of the foregoing shall be void.

6.9 <u>Authority</u>. Each Party warrants that it has the proper authority to enter into this Agreement. Client warrants that its execution or performance of this Agreement does not and will not constitute a breach of any other agreement to which it is a party or by which it is bound.

IN WITNESS WHEREOF, BCS and Client have each caused this Agreement to be signed and delivered by its duly authorized officer or representative, all as of the date stated below.

| BAHAMAS COMMUNICATIONS SERVICES, LTD. | CLIENT'S LEGAL NAME: |
|---|---|
| By: _____ | Signature: _____ |
| Printed Name: _____ | Printed Name: Capt Anthony Allens |
| Title: Director | Title: Port Controller |
| Date: 10/21/08 | Date: 21 October 2008 |
| Address: 6.K. SYMONETTE BUILDING, SHIRLEY ST. NASSAU BAHAMAS | Address: Prince George Wharf P.O. Box N8175 NASSAU, The Bahamas |
| | Tel: 242 356 5639 |
| | Fax: 242 322 5545 |
| | E-mail: ajallens@batelnet.bs |

In consideration of the Parties agreeing that (i) there will be no amendment to clauses 2.2, 2.3, 4.1 and 5.1 without the prior written consent of BBG Global AG, and (ii) notwithstanding the terms of clause 3, there will be no termination of

this agreement without the prior written consent of BBG Global AG, BBG Global AG joins this agreement solely for the purpose of ratifying and agreeing terms hereof as relate to service to be provided by BBG Global, AG, provided that all Calls are processed through the Call Platform.

Signature:
_____

Pilar Urbino, Managing Director

Date:
_____

Address:

BBG GLOBAL AG
Bahnof Park # 4
CH - 6340 Baar, Switzerland
Attn: Pilar Urbino
Telephone: +41 41 768-1070
Fax: + 41 41 768-1075
E-mail: notices@bbgcomm.com

## SCHEDULE I

Sales Location(s)

Name of Client's Sales Location(s) including address and country:

Name of Client: NASSAU PORT DEPARTMENT

Address: NASSAU BAHAMAS



## SCHEDULE II

### COMMISSION PAYABLE TO CLIENT

1) BCS will pay Client a Commission equal to **REDACTED**

