## CENTRIS OPERATOR SERVICES
## AGREEMENT

THIS AGREEMENT (the "**Agreement**") is made as of this 17ᵗʰ day of March, 2006 by and between Network Operator Services, Inc., a Texas corporation, d.b.a. Centris Information Services ("**Centris**"), and BBG Holdings, Ltd., a Bermuda corporation ("**Customer**"). Centris and Customer are referred to herein as "**Parties**", or a "**Party**". In consideration of the mutual promises contained herein, the Parties agree as follows:

1.0    <u>**DEFINITIONS.**</u>

1.1    For purposes of this Agreement, the following terms shall have the meanings set forth below. Capitalized terms appearing in these definitions are defined in this paragraph.

1.2    "**Affiliate**" means a Party, its parent, subsidiary, and/or any subsidiary of a Party's Affiliate.

1.3    "**Call Detail Record (CDR)**" means record containing information that identifies a particular telephone call (call date, call time, duration, origination number, etc.)

1.4    "**Completed Call**" means a call that is answered, placed and presumed to be billable by the Centris platform at the time of completion of the call but prior to actual billing.

1.5    "**Confidential Information**" means all information related to the business of a Party and its Affiliates, which the other Party receives as a result of this Agreement, which is not generally known to competitors, which was not already lawfully possessed or known by the receiving Party prior to such receipt or is thereafter obtained from a source other than the originating Party without breach of confidence by the receiving Party. For greater certainty, Confidential Information means all data and information whether in writing, machine-readable or other tangible form, or disclosed orally, that is of value to the disclosing Party. Confidential Information shall include, but not be limited to, information relative to the disclosing Party's customers, services, facilities, current or proposed business plans, roll-out plan, financial information, telephone calling card pattern information, prices, trade secrets, know-how, formulae, processes, data, network configuration and rights-of-way, drawings, proprietary information, customer lists, and other non-public information which concerns the business and operations of the disclosing Party.

1.6    "**Event of Default**" means the material breach of any provision in this Agreement.

1.7    "**Force Majeure Condition**" means any condition that prevents a Party from performing hereunder which is due to causes beyond such Party's reasonable control, including but not limited to, acts of God, acts of government, acts of the public enemy, acts of telecom carriers, switching/ telecom platform failures, accidents, fires, floods, civil disturbance or any other occurrence beyond the control of the Party.

-1-



EXHIBIT 4

1.8   "**Initial Term**" means the initial term of this Agreement as provided in Subparagraph 2.1 herein.

1.9   "**Invoice**" means the monthly invoice that Centris issues to Customer for Service provided. Invoices shall be delivered to and received by the Customer via Electronic format – E-mail or other means.

1.10   "**LEC**" means Local Exchange Carrier.

1.11   "**Centris Agent**" means a Centris operator service agent.

1.12   "**Term**" means the Initial Term of this Agreement and any extension(s) thereof pursuant to Subparagraph 2.2 herein.

1.13   "**Seizures**" means any inbound call whether or not a completed call, that creates a call detail record with or without billable time.

1.14   "**Work Second**" means a second during which a Centris Agent is handling a call.

1.15   "**Inquiry Call**" means calls from the end users who dispute rates or inquire of pricing.

1.16   "**Service(s)**" shall have the meaning set forth in attached Exhibits A, B, C, D, E, F and G.

2.0   **TERM; TERMINATION.**

2.1   The term of this Agreement shall be **one (1) year** beginning on the Effective Date (the "**Initial Term**").

2.2   At the end of the Initial Term, if neither Party is in default hereunder, the Agreement shall be automatically renewed every six (6) months (the

"**Subsequent Term**"). In the event either Party chooses not to renew the Agreement, notification to the other party must be in writing 30 days prior to the renewal date.

2.3   Either Party may terminate this Agreement pursuant to Subparagraph 2.2 herein or following written notice upon an Event of Default and failure to cure by the breaching Party within fifteen (15) days of delivery to the breaching Party of notice of an Event of Default.

2.4   Either Party may, without liability, terminate this Agreement, or any Service provided hereunder, upon reasonable prior written notice, if the Federal Communications Commission, or any state regulatory agency with appropriate jurisdiction, takes any action that materially affects the provision of such Service, or operations contemplated hereunder, and renders the Agreement, or the provision of such Service, illegal. In the event of the occurrence of any of the foregoing, the Service shall be terminated only to the extent that it is found to be illegal and the Parties shall, to the extent possible, negotiate a replacement Service and/or an amendment to this Agreement excluding such Service from the terms herein.

2.5   Upon termination or expiration of this Agreement, neither Party shall have any further rights or obligations hereunder; provided that Paragraphs 6, 7, 8, 10 and 26 shall survive termination or expiration of this Agreement. In addition, all payments which remain due and unpaid as of the termination date or which have accrued and are not yet payable, shall

-2-



be immediately paid upon termination or on the date upon which they are otherwise payable, whichever is later. In addition, upon termination or expiration of this Agreement, Centris shall be obligated to continue to provide Customer with all CDRs in progress.

3.0 **PROVISION OF SERVICE; SERVICE CHARGES.**

3.1 Service specifications ("**Service Specifications**"), responsibilities, and charges are described in attached Exhibits A through F. Centris shall also provide billing and collection services for Customer's intrastate calls (the "Intrastate Calls") as set forth in Exhibit G. Notwithstanding anything set forth in Exhibit A or anything else herein to the contrary, to the extent that Centris provides services to transport a call from the point of origination to Centris' switch or from Centris' switch to the point of termination, Centris will provide such services at cost with an agreed upon markup of 10% for inbound traffic and 25% for outbound traffic (above operations overhead), to be reviewed annually regardless of whether such services are provided through a TI, VOIP, 800 toll free number or otherwise. At Customer's request, Centris will provide reasonably detailed documentation of the cost to Centris of providing such services.

3.2 Centris will use its best efforts to ensure that the voice circuit be torn down at the termination of all calls. For calls with durations, as measured by Centris' Operator Service Call processing platform greater than sixty-two (62) minutes, in the event any equipment in the path of the voice circuit fails to recognize that the callers have disengaged the calls ("**Hung Port**"), Centris shall be responsible for the origination and transport costs of such Hung Ports. Any amounts owed by Centris pursuant to this provision shall be offset against Invoice amounts due by Customer to Centris at Customer's cost (according to the point of origin from which the call came).

3.3 Centris shall establish and make available to Customer a FTP site which shall allow Customer to access and download the previous day's CDRs.

4.0 **PAYMENT FOR SERVICE; CREDIT APPROVAL.**

4.1 Each month during the Initial Term and Subsequent Term, if applicable, Centris shall issue an Invoice to Customer for all Service provided hereunder. Invoiced amounts shall be due and payable within fifteen (15) calendar days from the date the Invoice is received by Customer.

4.2 Charges for Service are exclusive of all applicable taxes, which shall be separately identified on each Invoice and paid as a part of such Invoice, which however, shall not include any income taxes due and owing by Centris.

4.3 Except for those circumstances where Centris provides billing and collection services, Customer is responsible for the billing of CDRs and thereby is also responsible for all taxes associated with the collection of various taxes applicable to telecom services associated with such CDRs – including but not limited to Federal Excise



Taxes, USF Taxes, Sales Taxes, Poison Control and 911.

4.4 Customer shall notify Centris in writing of any disputed Invoice amount within thirty (30) days of the date the Invoice was received on which the amount appears. Notice shall include reasonable documentation in support of Customer's claim. Each Party shall use its best efforts to resolve billing disputes as expeditiously as possible. If a dispute cannot be resolved within thirty (30) days immediately following Customer's notice of dispute, either Party may initiate arbitration pursuant to Paragraph 10 herein. Under no circumstances shall Customer be relieved of its obligation to pay the undisputed portion of an Invoice in accordance with Subparagraph 4.1.

4.5 Failure to comply with the requirements of this Paragraph 4 shall be an Event of Default subject to the cure provisions in Paragraph 9 of this Agreement.

5.0 **SYSTEM MAINTENANCE.**

5.1 Centris will use its best efforts to ensure that all systems utilized hereunder will be maintained in accordance with industry standards. In the event that planned system maintenance during maintenance windows requires the interruption of Services (in excess of 15 minutes), Centris shall notify Customer of such interruption in Services at least twenty-four (24) hours in advance of such interruption and Centris shall use its best efforts to repair the system and rectify the problem within a reasonable period of time.

5.2 Centris shall be liable to Customer for any net revenues lost by Customer which are attributable to billable CDRs processed but not transferred to Customer due to any Centris' system failure.

5.3 Customer reserves the right to terminate this Agreement immediately in its sole discretion if quality of service falls below industry standards.

5.4 In the event that CDR's are inadvertently billed by Centris, Centris shall be liable to Customer for any net revenues due Customer at the rate Customer would have billed the CDR's less a mutually agreed upon rate of billing and collections.

6.0 **CONFIDENTIAL INFORMATION.**

6.1 Centris and Customer shall regard and preserve as confidential all Confidential Information received from the other Party.

6.2 A Party shall use Confidential Information obtained from the other only to fulfill its obligations under this Agreement. No other right or license to use the trademarks, inventions, copyrights or patents is granted or implied by this Agreement. Each Party shall exercise such care to avoid disclosure or unauthorized use of Confidential Information obtained from the other as a prudent business person would take to protect its own confidential information. Access to Confidential Information shall be limited to only such employees or agents of a Party who need such information to perform under this Agreement and who are bound to maintain such Confidential Information in confidence under terms

-4-



and conditions similar to, and not less stringent than, those set forth herein.

6.3 Confidential Information shall remain the property of the disclosing Party, and shall be destroyed or returned to the disclosing Party either: (a) upon request of the disclosing Party; (b) after the need for the information has expired; or (c) upon termination of this Agreement.

6.4 A Party shall have no obligation with respect to Confidential Information that: (a) is already in the possession of such Party, free from any obligation to keep such information confidential; (b) is or becomes publicly known through no wrongful act of the receiving Party; (c) is rightfully received from a third party without restriction and without breach of this Agreement; (d) is independently developed by the receiving Party without the use of any Confidential Information of the disclosing Party and/or its Affiliates; or (e) must be disclosed pursuant to the lawful order of a court or government agency having jurisdiction over the Party.

6.5 Centris hereby represents and warrants to Customer that Centris knows, it is in full compliance and will remain in full compliance with the requirements for safeguarding personal and credit card holder information known as Payment Card Industry ("PCI") Data Security Standard.

6.6 In the event of a breach or threatened breach of this Paragraph 6, and without limiting any other rights, the non-breaching Party shall be entitled to obtain an injunction to protect its rights hereunder.

7.0 <u>INDEMNIFICATION</u>.

7.1 Centris agrees to, and does hereby, indemnify Customer and Customer's directors, officers, shareholder, employees, agents, representatives and Affiliates against all claims, damages, losses, costs, assessments, injuries, liabilities, and expenses, including reasonable attorneys' fees and expenses, arising out of (i) Centris' performance under this Agreement, (ii) willful misconduct or a negligent act or omission or caused by the willful misconduct of any person employed by Centris, and (iii) failure to abide by applicable state and federal laws; provided, however, Centris' indemnification obligation pursuant to Section 7.1(i) above shall not exceed $100,000. This limitation shall not apply to Centris' obligations to Customer pursuant to <u>Exhibit G</u>.

7.2 Customer agrees to, and does hereby, indemnify Centris and Centris' directors, officers, shareholder, employees, agents, representatives and Affiliates against all claims, damages, losses, costs, assessments, injuries, liabilities, and expenses, including reasonable attorneys' fees and expenses, arising out of (i) Customer's performance under this Agreement, (ii) willful misconduct or a negligent act or omission or caused by the willful misconduct of any person employed by Customer, and (iii) failure to abide by applicable state and federal laws; provided, however, Customer's indemnification obligation pursuant to Section 7.2(i) above shall not exceed $100,000.

8.0 <u>WARRANT/LIMITATION OF LIABILITY</u>.



8.1     Centris warrants that the Services provided herein shall conform to this Agreement and the Service Specifications.

8.2     Disclaimer of Warranties.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, THE PARTIES MAKE NO WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, IN CONNECTION WITH ANY SERVICE, INCLUDING WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR THOSE WARRANTIES ARISING FROM A COURSE OF PERFORMANCE, A COURSE OF DEALINGS OR TRADE USAGE, AND ANY AND ALL IMPLIED WARRANTIES ARE DISCLAIMED.

9.0     **EVENTS OF DEFAULT**.

9.1     The following shall constitute an Event of Default under this Agreement:

(a)     A Party's failure to cure, within fifteen (15) days following notice by the other Party, a material breach of any term or condition of this Agreement, except any provision in Paragraph 4.

(b)     A Party's breach of Paragraph 4 herein and failure to cure such breach within five (5) days following notice of the breach.

(c)     A Party's discontinuation of business as a going concern.

(d)     A Party's insolvency, bankruptcy or becoming the subject of receivership.

(e)     Appointment of a trustee or liquidator of all or a substantial part of a Party's assets.

(f)     A substantial part of a Party's property is or becomes subject to any levy, seizure, assignment or sale for or by any creditor or governmental agency without being released or satisfied within ten (10) days unless a ninety (90) day notice of the same has been provided.

10.0    **ARBITRATION**.

10.1    If any dispute arising under this Agreement is not resolved by the Parties within thirty (30) days immediately following a Party's written notice of such dispute to the other, then either Party may request arbitration of the dispute in Longview, Texas in accordance with the procedures established by the American Arbitration Association.

11.0    **NOTICES**.

11.1    Notices provided hereunder shall be in writing and delivered by hand, certified mail, courier or transmitted by facsimile or e-mail to the following address:

If to Centris:

Centris Information Services
119 W. Tyler Street, Suite 260
Longview, TX  75601
Attention:  Jamie Maddox

If to Customer:

BBG Holdings, Ltd
1658 Gailes Blvd. Suite B
San Diego, CA 92154
Attention:  Pilar Urbino



-6-

12.0 **ASSIGNMENT**.

12.1 Neither Party may assign this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld.

12.2 This Agreement is binding upon, and inures to the benefit of Customer and Centris, and their respective successors and assigns.

13.0 **ADVERTISING OR PUBLICITY**.

13.1 Neither Party may use the other Party's name in a publicity release or advertisement without obtaining the prior written consent of the other Party.

14.0 **FORCE MAJEURE**.

14.1 A Party shall not be liable to the other for any delay or failure to perform hereunder which is caused by a Force Majeure Condition. If the Force Majeure Condition continues for a period of thirty (30) days, this Agreement may be terminated by either Party upon written notice to the other.

14.2 Notwithstanding anything herein to the contrary, a Party's strict compliance with Paragraphs 5 and/or 6 herein shall not be excused by any Force Majeure Condition.

15.0 **LIABILITY**.

15.1 Centris shall not be liable for loss or damage sustained by reason of delay or interruption in the Service, whatever the reason for such delay or interruption. Centris shall not be liable for any act or omission of any entity furnishing facilities or services in conjunction with Centris' services.

16.0 **NO AGENCY**.

16.1 The Parties to the Agreement shall treat each other as independent contractors. Neither Party is authorized to act as an agent for or legal representative of the other Party and neither Party shall have authority to assume or create any obligation on behalf of, in the name of or binding upon the other Party.

17.0 **NONEXCLUSIVE AGREEMENT**.

17.1 The Parties hereto acknowledge and agree that this Agreement is not an exclusive Agreement and that the Parties are free to contract with other third parties to provide and/or receive services contemplated by this Agreement.

18.0 **WAIVER**.

18.1 The failure or delay of either Party to require the other's performance of any terms herein shall not affect the right of that Party thereafter to enforce the same; nor shall the waiver of a breach be deemed a waiver of any subsequent breach, or as a waiver of the term or provision breached.

19.0 **SEVERABILITY**.

19.1 If any provision of this Agreement shall be held invalid, illegal or unenforceable, such invalidity, illegality or enforceability shall not affect any other provision hereof and this Agreement shall be construed as if such provision had never been contained herein.

20.0 **HEADINGS**.

20.1 The paragraph headings in this Agreement are for convenience only



and shall not affect the construction hereof.

21.0 **EXHIBITS**.

21.1 All Exhibits attached to this Agreement are incorporated herein by this reference and constitute a part of the Agreement.

22.0 **CHOICE OF LAW**.

22.1 This Agreement shall be construed and enforced under the laws of the State of Texas.

23.0 **RULES OF CONSTRUCTION**.

23.1 No rule of construction requiring interpretation against the draftsman hereof shall apply in the interpretation of this Agreement.

24.0 **ENTIRE AGREEMENT; AMENDMENT**.

24.1 This Agreement, together with the Exhibits, constitutes the entire agreement between the Parties and supersedes all previous discussions or agreements with respect to the subject matter hereof. No modification or supplement to this Agreement shall be binding unless made in writing and duly executed by both Parties.

24.2 In the event of a conflict between this Agreement and any Exhibit the terms of this Agreement shall govern.

25.0 **REGULATIONS**.

25.1 Subject to Paragraph 27, this Agreement is made subject to all present and future valid orders, and regulations of any regulatory body having jurisdiction over the subject matter hereof or the parties hereto, and

to the laws of the United States of America or any of its states having jurisdiction. In the event this Agreement or any of its provisions shall be found contrary to, or is in conflict with, any such order, rule, regulation or law, this Agreement shall be deemed modified to the extent necessary to comply with any such order, rule, regulation or law, and shall be modified in such a way as is consistent with the form, intent, and purpose of its surviving provisions.

26.0 **LEGAL EXPENSES**.

26.1 The prevailing Party in arbitration and/or legal action brought by one Party against the other Party and arising out of this Agreement shall be entitled, in addition to any other rights and remedies it may have, to reimbursement for its expenses, including court costs and reasonable attorney fees.

27.0 **UNENFORCEABLE PROVISIONS**.

27.1 If any part of this Agreement is invalid or not enforceable under applicable law, the Parties together shall determine within 20 days whether the remaining parts of this Agreement can continue to operate without the scope and intention of this Agreement being materially altered. If the Parties agree that the scope and intention of this Agreement: (i) would be materially altered following the removal of the invalid or unenforceable part, this Agreement shall immediately terminate; or (ii) would not be so altered, then this Agreement shall continue to operate without the application of the invalid or unenforceable part. If the Parties

cannot agree as to whether the
Agreement would be so altered, the
parties shall follow the Dispute
Resolution procedure set out in
Paragraph 10 to resolve the issue.

28.0     **DISASTER RECOVERY PLAN**.

28.1     During the Term of this Agreement,
         Centris shall adopt and follow a
         Disaster Recovery Plan in form and
         substance reasonably acceptable to
         Customer.

         *[Signature Page Follows]*



IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**BBG Holdings, Ltd**, a Bermuda corporation

**Network Operator Services, Inc.**, a Texas corporation (d.b.a. Centris Information Services)

By: _____

By: _Jami Maddox_____

Name: _INFAE S BAKER_
Title: _VP_
Date: _05|03|06_

Jamie Maddox
Chief Executive Officer
Date: _3/17/06_

[Signature Page to Operator Services Agreement]



## Exhibit A

### Description of Pricing Categories:

#### Live Agent

Means a work second during which a Centris Agent is handling a call.
This time begins when the agent engages the call until they
release the call.

#### Automated Call Handling

Means any call that the IVR system engages and does not have Live Agent time.
This specifically excludes the "hold queue" for live agents

#### Platform Charge

The Platform Charge is based on minutes from the seizure of switch port until the
switch ports are released. (the duration of the call). This charge is in addition to
either the Live Agent or Automated Call charges.

#### Network

Depending on transport method - this represents - Origination and Termination
Long Distance Minutes. Rates vary by origination point and termination point.
See the Centris web site for detail rates. Rates are subject to change pending
market conditions.

### Other Categories of Charges:

#### Validation

Validation charges apply to collect and credit card calls.
It is possible to have more than one validation charge per call - i.e. multiple attempts to
complete a call to different numbers or multiple billing options.





## Exhibit B

1/1/2006

| Live Agent | | | |
|---|---|---|---|
| Monthly Work seconds | Monthly Work Minutes | Price / Minute | Price / Second |
| 60 | 1 | | |
| 300,000 | 5,000 | | |
| 480,000 | 8,000 | | REDACTED |
| 780,000 | 13,000 | | |
| 1,320,000 | 22,000 | | |
| 2,220,000 | 37,000 | | |
| 3,660,000 | 61,000 | | |
| 5,220,000 | 87,000 | | |
| 6,540,000 | 109,000 | | |
| 7,680,000 | 128,000 | | |
| 9,000,000 | 150,000 | | |
| 10,560,000 | 176,000 | | |
| 12,420,000 | 207,000 | | REDACTED |
| 14,640,000 | 244,000 | | |
| 17,640,000 | 294,000 | | |
| 20,760,000 | 346,000 | | |
| 25,500,000 | 425,000 | | |
| 32,400,000 | 540,000 | | |
| 40,500,000 | 675,000 | | |
| 50,640,000 | 844,000 | | REDACTED |

Based on 70 / 30 allocation between Monterrey
and Longview Call centers

Pricing Tiers are "Cliff Level" - upon reaching a pricing tier, all
seconds or minutes are priced at the achieved price level.





## Exhibit C

1/1/2006

| Automated Call Handling | | |
|---|---|---|
| Call Volume | | Price |
| From | To | |
| 1 | 2,500 | $ |
| 2,501 | 7,500 | $ |
| 7,501 | 20,000 | $ |
| 20,001 | 40,000 | $ |
| 40,001 | 75,000 | $ |
| 75,001 | 100,000 | $ |
| 100,001 | 150,000 | $ |
| 150,001 | 300,000 | $ |
| 300,001 | 500,000 | $ |
| 500,001 | 750,000 | $ |
| 750,001 | 1,000,000 | $ |
| 1,000,001 | 1,500,000 | $ |
| 1,500,001 | 2,000,000 | $ |
| 2,000,001 | 3,000,000 | $ |
| 3,000,001 | 5,000,000 | $ |
| 5,000,001 | 7,500,000 | $ |
| 7,500,001 | 10,000,000 | $ |
| 10,000,001 | 15,000,000 | $ |

REDACTED (rows 7,501–20,000)

REDACTED (rows 1,000,001–1,500,000)

One-time set up charges apply for Automated call handling.
Voice recordings -
IVR Set up                    REDACTED

Pricing Tiers are "Cliff Level" - upon reaching a pricing tier, all
seconds or minutes are priced at the achieved price level.





## Exhibit D

1/1/2006

| Platform Charge | |
|---|---|
| Total Minutes | Charge/Min |
| 1 | $ |
| 150,000 | $ |
| 250,000 | $ |
| 400,000 | $ REDACTED |
| 500,000 | $ |
| 650,000 | $ |
| 850,000 | $ |
| 1,000,000 | $ |
| 1,250,000 | $ |
| 1,750,000 | $ |
| 2,250,000 | $ REDACTED |
| 2,600,000 | $ |
| 3,250,000 | $ |
| 5,000,000 | $ |
| 7,500,000 | $ |
| 10,000,000 | $ REDACTED |
| 12,500,000 | $ |
| 15,000,000 | $ |
| 20,000,000 | $ |

Pricing Tiers are "Cliff Level" - upon reaching a pricing tier, all
seconds or minutes are priced at the achieved price level.

| Validation Charges | | |
|---|---|---|
| LEC | $ | |
| Bank Card | $ | REDACTED |





## Exhibit E

### Definition of Services

#### Operator Services - Billing Types

–Collect Calling –
Allows caller to have called party pay for call

–3rd Party Billing –
Allows caller to bill the call to a number other than the one they are calling

–Bill To Origination –
Allows caller to bill call to their own ANI. (Residential Phones only)

–Person-To-Person –
Allows caller to find and speak to a particular person or specific extension. Operator makes sure that the person or extension is on the line before charges begin

–Station-To-Station –
Operator assisted call where the calling party agrees to talk to whomever answers

–Credit Card –
Bill to Credit Card

–Calling Card –
Bill to LEC calling cards - where billing arrangements are available.

#### Other Operator Services:

–Busy Line Verification –
Request an Operator to verify the line is busy.  This service requires special connectivity.

–Busy Line Interrupt –
Requests an Operator to interrupt a call in progress.  This service requires special connectivity.

–Emergency Calls –
In the event that a caller dials "0" rather than 911.  The Operator will connect the caller to the PSAP ANI provided by the customer.  The Operator will remain in the call until the conclusion of the call to ascertain that the issue is resolved.

–Customer Service –
Splash of calls to Local Exchange carrier, Provide correct dialing instructions for customer service or Centris can provide Customer Service on behalf of LEC.  Additionally, the Operator will provide dialing instructions.

#### Automated Call Handling

Automated call handling can process the following billing types - Collect, Calling Card and Credit Card.  The caller may access a "Live Agent" by pressing zero.





## Exhibit F

### Optional Services

| 800 Numbers ( Domestic U.S and Territories, Canada) | | |
|---|---|---|
| Price | $ | REDACTED |

| International Toll Free ( ITFS) | |
|---|---|
| Price | Pass through from carrier |

| Live Agent - Priority Queue | | |
|---|---|---|
| Per Operator Work Second | $ | REDACTED |
| Promotes account to front of Line in Call queue. Limited to no more that 10% of all Live Op call volume | | |

| Billing File Management: | | |
|---|---|---|
| Per Billing File Submitted | $ | REDACTED |
| In the event that Centris manages the billing of Collect and or Credit Card transactions on behalf of the Customer - a billing file management charge shall apply | | |
| This is not applicable to EMI records submitted to Customer. | | |

Pricing for Network Services available via Centris
Web Portal.



### Exhibit G

### Centris Operator Services Agreement with BBG Holdings, Ltd ("Customer")

### Billing and Collection Services

1.      Billing and Collection Services. Centris, through its relationship with Billing Concepts ("BIC"), will provide billing and collection services for Customer's intrastate calls (the "Intrastate Calls" and "B&C Services," respectively). Centris shall be responsible for all taxes associated with the collection of various taxes applicable to telecom services associated with this B&C Services – including but not limited to Federal Excise Taxes, USF Taxes, Sales Taxes, Poison Control and 911.

2.      BIC Sub-CIC. Centris hereby represents and warrants to Customer that all Intrastate Calls shall be billed through a BIC or a billing company acceptable to Customer. Centris shall instruct BIC to bill all Intrastate Calls with a Sub-CIC account (Carrier Identification Code), so that there is a clear record of calls billed by Centris on behalf of Customer under this Agreement. Within three (3) business days of receipt, Centris shall submit to BIC all electronic call data records ("CDRs") submitted by Customer. Centris shall provide Customer with access to BIC's web-based reports indicating all CDRs submitted for billing all amounts collected by BIC, and all amounts remitted by BIC to Centris.

3.      Payments to Customer. Centris shall remit to Customer all amounts paid to Centris by BIC on account of CDRs submitted for collection pursuant to Section 2 above, in the week following the week in which Centris collected funds from BIC. Funds shall be remitted via wire transfer to an account designated by Customer. Centris shall pay to Customer interest, at the Bank of America NT&SA prime rate plus 4 points, on any amounts not paid on time.

**REDACTED**      4.      Fees. In consideration for the B&C Services for Intrastate Calls, Customer shall pay Centris      f net amounts collected from BIC. Centris shall deduct the      fee from remittances to the Customer.

5.      Audit Rights. Customer shall have the right to audit at its cost, the books and financial records of Centris, relating to B&C Services provided by Centris under this Agreement, during normal business hours following reasonable advance notice as and when it deems it appropriate, but no more frequently than quarterly. In the event of any discrepancy resulting in a failure to remit funds to Customer, Centris shall remit those missing funds to Customer within five (5) days from the completion of the audit and, if the amount underpaid exceeds $10,000, Centris shall also reimburse Customer for the cost and expenses relating to such audit.

6.      Customer Service. Inquiry Services are provided by Billing Concepts. Cost for these services will be on a pass through basis to the Customer, and deducted from payments for Customer.

CENTRIS

CUSTOMER